UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Case No. 23-20646-gmh |
| Window Select, LLC, | Chapter 11 (Subchapter V) |
|     Debtor. | |

| | |
|---|---|
| Paul G. Swanson, Liquidating Trustee, | |
|     Plaintiff, | |
| v. | Adv. No. 25-20__-gmh |
| Restoration Hardware, Inc. and Justin Kiswardy, | |
|     Defendants. | |

## COMPLAINT

Paul G. Swanson (the "Liquidating Trustee"), as the Liquidating Trustee for the Window Select, LLC Liquidating Trust, by his attorneys, Swanson Sweet LLP, as and for his complaint against the defendants, alleges as follows:

### Nature of the Proceeding

1. Window Select, LLC (the "Debtor") was a home improvement business in southeastern Wisconsin that sold customers windows, siding, doors, and other home improvement products. The business structure was straightforward: customers signed contracts, paid deposits, had the Debtor install the purchased home improvement products (if they were lucky), and then paid the remaining balance due.

2. Many customers received nothing. Simply put, when the Debtor received a customer deposit upon the execution of a contract, the Debtor did not earmark or reserve the deposit for that specific customer. The deposits instead were placed in the Debtor's general operating account and used to pay expenses unrelated to that specific contract. Thus, when it

1

came time for the Debtor to perform under a specific contract (by ordering windows, for example), the Debtor could not use the deposit associated with that contract. To solve this funding problem, the Debtor recruited new customers, using new deposits to purchase and pay for products for pre-existing customers.

3. This "solution" was unsustainable. Angry customers complained to the law enforcement, commenced civil actions in state court, and tried to recover what they could. Trade vendors lost patience, put the Debtor on cash-on-delivery terms, and tried to collect their unpaid balances too. Banks terminated the Debtor's right to remotely deposit checks and repeatedly closed bank accounts for abuse. In 2023, after months of financial challenges, the Debtor did the inevitable and filed a petition for relief under chapter 11 of the Bankruptcy Code so that it could liquidate its assets efficiently and equitably.

4. Like most fraudulent schemes, there is a natural and obvious question: what happened to the money? As the Liquidating Trustee sees it, Justin Kiswardy, the Debtor's sole member, utilized the Debtor's bank accounts as his own, transferring millions of the Debtor's funds to pay his personal expenses and sustain a lavish lifestyle. For instance, the Debtor paid for vacations at expensive hotels (such as the Ritz-Carlton and Nemacolin Resort), entertainment expenses (gambling at Potawatomi Hotel and Casino), and other personal expenses (rental expenses, house payments, and groceries). These transfers deprived the Debtor of over $3.4 million which it could have used to fund its business operations.

5. After the Debtor confirmed its plan of liquidation, the Liquidating Trustee was appointed to investigate and potentially unwind some of those transfers. In this adversary proceeding, the Liquidating Trustee seeks to avoid and recover twenty-five transfers from the

2

Case 25-02017-gmh    Doc 1    Filed 02/11/25    Page 2 of 16

Debtor to Restoration Hardware, Inc. which he believes were used to purchase high-end furnishings and accessories.

## Parties

6. The Liquidating Trustee is the liquidating trustee for the Window Select, LLC Liquidating Trust. His principal place of business is 107 Church Avenue, Oshkosh, Wisconsin 54901.

7. Restoration Hardware, Inc. ("Restoration Hardware") is a Delaware corporation registered as a foreign corporation with the Wisconsin Department of Financial Institutions, having a principal office located at 15 Koch Road, Suite K, Corte Madera, California 94925. Its Wisconsin registered agent is Corporation Service Company, 33 East Main Street, Suite 610, Madison, Wisconsin 53703. Its Chief Executive Officer is Gary Friedman.

8. Justin Kiswardy is an adult resident of either the state of Wisconsin or Pennsylvania. Based on information from the Wisconsin Circuit Court Access Program, Mr. Kiswardy's address is 1284 Arrowood Drive, Pittsburgh, Pennsylvania 15243. He may also reside at 9082 Mill Creek Road, Lenexa, Kansas 66219.

## Jurisdiction and Venue

9. This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(H) and 1334(b). The Liquidating Trustee consents to entry of final orders or judgment by this Court.

10. Venue is proper in the United States Bankruptcy Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1409(a).

11. This adversary proceeding relates to *In re Window Select LLC*, Case No. 23-20646-gmh, the above-captioned chapter 11 proceeding filed in this Court.

3

## Factual Background

### A. The Debtor's Business

12. Mr. Kiswardy became involved in the window business in 2012, when he met the founders of Universal Windows Direct—a company located in Cleveland, Ohio.

13. In August 2019, Mr. Kiswardy left Universal Windows Direct and organized the Debtor as a limited liability company under the laws of the State of Wisconsin. He was the Debtor's sole member and the managing member until he resigned in December 2022.

14. The Debtor operated a home improvement business in southeastern Wisconsin that sold windows, siding, doors, and other home improvement products. The Debtor also installed and serviced those home improvement products.

15. At its peak, the Debtor employed approximately sixty individuals across various departments, including an inside sales team, an outside sales team, a contract management team, and a customer service team. The outside sales team employed approximately ten to fifteen individuals who visited prospective customers to sell the Debtor's products and services. The inside sales team contacted customers to arrange for an outside salesperson to visit and sell windows.

16. If the sales team was successful, the Debtor's customers often entered into agreements under which the Debtor would install new windows or doors at the customers' personal residences. Typically, at that same time, customers would pay the Debtor a deposit representing a portion of the contract's total value. The value of the deposits was not uniform; the deposits varied based on what the salesperson negotiated with the customer for that specific contract.

17. When the Debtor pitched and solicited these contracts, the Debtor's sales team suggested that products would be ready for installation within sixteen weeks, at which point the Debtor could schedule installation to occur within a month. Upon installation, the customer would typically pay the remaining balance due under the contract.

18. Internally, the Debtor's employees would input information about those contracts into a customer relationship management (CRM) software program called LeadPerfection. The Debtor used the software to track customer contracts from intake through installation.

19. Unfortunately for its customers (and despite the substantial volume of customers and contracts), the Debtor did not operate under any cash management plan. Customer deposits were treated as regular business transactions and dumped into the Debtor's general operating account. The deposits were not held in escrow or reserve, nor did the Debtor maintain clear records of which deposits were received but not yet used.

20. The absence of a cash management plan had costly consequences for the Debtor's customers. For many, their deposits were either spent on some other customer's contract or were transferred for Mr. Kiswardy's personal benefit to fund his lifestyle. For instance, in 2020, the Debtor transferred over $1 million for Mr. Kiswardy's personal benefit, paying for grocery expenses at Pick n' Save and Sendik's, meals out at restaurants, rent at a personal residence in Ohio, personal flights, and hotels and vacations.

21. The transfers to Mr. Kiswardy diminished the Debtor's capital position and impaired its liquidity. As a result, the Debtor could not order many customers' products (or pay for them if they were ordered) and could not refund the deposits. And, as a further result, the Debtor began relying on new customers (with new deposits) to fund old contracts.

5

Case 25-02017-gmh    Doc 1    Filed 02/11/25    Page 5 of 16

22. In 2021, based on the substantial funds transferred for Mr. Kiswardy's benefit, the Debtor began the year undercapitalized and the business operation began to crack. In February, the Better Business Bureau identified "a Pattern of Complaints" that "pertained to customers stating that they paid for installation of windows/doors, and these services [were] not being completed, being partially completed, and/or being installed improperly. Consumers also stated the business does not consistently respond to their attempts to reach out to them for assistance". Better Business Bureau, Window Select, LLC Business Profile (last accessed Feb. 11, 2025), available at https://www.bbb.org/us/wi/menomonee-falls/profile/replacement-windows/window-select-llc-0694-1000036051.

23. The Debtor's inability to perform under its customer contracts was largely (if not all) the direct result of the Debtor's inability to use its own cash for business purposes. In 2021 (in addition to the substantial sums transferred in 2020), the Debtor transferred over $2.8 million for Mr. Kiswardy's personal benefit. Most notably, the Debtor helped pay for Mr. Kiswardy's multi-million-dollar residence in Burlington, Wisconsin. On March 26, 2021, and April 12, 2021, the Debtor transferred $50,000.00 and $100,000.00 to the seller's agent, and then in May 2021, the Debtor made three separate transfers of $150,000.00, $310,000.00, and $220,000.00 to the title company.

24. To fund the balance, Mr. Kiswardy also caused the Debtor to incur a $1,245,000.00 "business" loan from Greenwoods State Bank. That loan was secured by a general business security agreement that blanketed the Debtor's assets (and a mortgage on Mr. Kiswardy's residence), which reduced the Debtor's ability to obtain asset-based lending from other commercial lending institutions. (In addition, the Debtor was obligated to make payments to Greenwoods State Bank, making ten payments towards the loan balance.)

6

Case 25-02017-gmh    Doc 1    Filed 02/11/25    Page 6 of 16

25. Around the time the Debtor transferred funds for Mr. Kiswardy's personal residence and incurred the obligation to Greenwoods State Bank, the Debtor's liabilities began to exceed the value of its assets. In addition, the Debtor experienced problems managing its inventory, customers complained about delays in finishing their contracts, and the Debtor fell behind on its obligations to trade vendors.

26. Midway through 2021, the Debtor simply stopped maintaining financial records at all and no longer logged data into its QuickBooks account. From that point forward, the only data that the Debtor maintained was through LeadPerfection, a customer management software but not an accounting software. Thus, while the Debtor could keep track of revenues and costs associated with customer orders, it could not keep track of payroll, rents, utilities, loans, and other expenses that would allow the Debtor to monitor and manage its cash flow. This left the Debtor without the data necessary to make important decisions regarding its business operations, such as its cash flow and liquidity positions.

27. If the Debtor had accurately maintained those records, it would have discovered that it was (as it was in the beginning of the year) inadequately capitalized. Following the transfers related to Mr. Kiswardy's house, the Debtor rarely had more than $150,000.00 in its general operating account with Bank of America. The daily ledger balance never exceeded that amount for the rest of May 2021, and only did so twice in June 2021, four times in July 2021, three times in August 2021, twice in September 2021, and once in November 2021 and December 2021.[1] In contrast, the Debtor had negative daily ledger balances once in June 2021, twice in July 2021, once in August 2021, five times in September 2021, six times in October

---

[1] $150,000.00 is a useful benchmark considering that the Debtor's general operating account shows that the Debtor's bi-monthly payroll regularly exceeded $100,000.00.

7

2021, four times in November 2021, and seven times in December 2021. What is more, following the transfers for Mr. Kiswardy's personal residence, the Debtor issued several checks that bounced due to insufficient funds. The Debtor had one NSF check in June 2021, eight in July 2021, seven in August 2021, eighteen in September 2021, eight in October 2021, seventeen in November 2021, and seven in December 2021.

28. To fund its cash shortfall and fulfill some of its preexisting contracts, the Debtor relied on new customers and after-acquired deposits. Based on a Balances Due report from LeadPerfection, as of September 30, 2021, the Debtor was paid and had accepted deposits totaling approximately $3.9 million for over 800 jobs that were not yet complete (i.e., the windows had been measured and ordered, or the Debtor was scheduled to measure the windows). Indeed, many of the claims filed in this bankruptcy case originated in 2021. Based on the claims that included either a copy of their contract or information relating to the contract, seven claims originated from contracts that were dated in May 2021, ten originated from contracts that were dated in June 2021, seventeen originated from contracts that were dated in July 2021, eighteen originated from contracts that were dated in August 2021, eighteen originated from contracts that were dated in September 2021, and eleven originated from contracts that were dated in October 2021.

29. Given the circumstances under which Window Select procured these contracts, it should have become increasingly obvious that the Debtor could not meet its current or future obligations. Aside from the continual transferring and spending of customer deposits, the Debtor lacked the ability to borrow on favorable terms. Its assets were already encumbered by a general business security agreement, and it could offer no other legitimate collateral to lenders.

8

30. In addition, by continuing to solicit new customer contracts and accept deposits, the Debtor also continued to amass liabilities without a clear path forward under which it could fulfill its obligations. The Debtor reasonably should have believed that it would be unable to pay its debts as they matured and that subsequent customer contracts would not be completed.

31. The Debtor's financial challenges were amplified at the end of 2021, when Bank of America closed the Debtor's general operating account based on account abuse. In addition, the Debtor struggled to fulfill its payroll obligations, bouncing payrolls with Paychex, Inc. and losing the ability to process and pay employees through the platform. Additionally, major suppliers and manufacturers cut ties or dramatically revised their terms of business, requiring that the Debtor pay cash upfront for orders (which the Debtor could not do). Customers also sought to reverse credit card charges, causing the Debtor to incur substantial chargeback expenses. Employees started leaving the Debtor too.

32. In early 2022, Cogent Analytics Inc. ("Cogent") was retained to assist the Debtor with resolving its longstanding operational issues. At that time, the Debtor was in dire straits: it was horribly in debt and barely generating enough cash to cover its overhead expenses. The Debtor's accounts payable exceeded $660,000.00. For the vendors who were still willing to work with the Debtor, they required that the Debtor pay cash-on-delivery. None of the Debtor's vendors were willing to extend any form of credit.

33. In addition, the Debtor had entered into contracts for approximately 1,700 jobs that were sold, measured, and paid for (partially through deposits), but that had not yet been installed. The estimated cost to finish those jobs was estimated to be approximately $7 million.

34. Cogent attempted to address these substantial challenges, including by attempting to reconstruct the Debtor's books and records so that the Debtor could solicit financing. In fact,

Cogent made an offer at the end of March 2022 to fund installations that were outstanding with the Debtor in exchange for 51% ownership interest in the company. However, Mr. Kiswardy declined that offer and, based on the Debtor's limited assets, substantial unfunded liabilities, and poor financial records, Cogent could not solicit any other outside funding.

35. As the year progressed, the Debtor's financial challenges did not improve. At some point in 2022, the Debtor was completely unable to open a bank account in its own name. It still had contracts that were executed from 2020 that had not been performed (meaning some customers had waited two years or more to receive the product they had ordered and paid for), and customers were regularly commencing lawsuits.

36. By October 2022, Cogent and Mr. Kiswardy agreed that the Debtor needed to seek relief under chapter 11 of the Bankruptcy Code. The Debtor had already stopped taking customer orders and proceeded to hire bankruptcy counsel.

37. In December 2022, as the Debtor was preparing to file its petition for relief, Cogent determined that for it to take over the Debtor's business and guide it through bankruptcy, Mr. Kiswardy could no longer be involved. Mr. Kiswardy appointed Andrew Parsons from Cogent as the Debtor's chief executive officer, authorized the Debtor to file a voluntary petition for relief under the Bankruptcy Code, and resigned as manager of the Debtor.

38. On February 17, 2023 (the "Petition Date"), the Debtor filed in the United States Bankruptcy Court for the Eastern District of Wisconsin a voluntary petition for relief under chapter 11 of the Bankruptcy Code and elected to proceed under subchapter V.

39. The Debtor's initial filings indicates that the Debtor commenced the bankruptcy case to achieve two goals: (1) for those customers who wanted the home improvement services for which they contracted performed in accordance with that contract, to assume and assign those

contracts to a third-party; and (2) to create a liquidating trust to collect the Debtor's assets (including avoidance actions) and make distributions to creditors in accordance with the Bankruptcy Code's distribution scheme.

40. On December 13, 2023, this Court confirmed the Debtor's plan of liquidation. Consistent with the Debtor's purpose in filing the case, the plan established a liquidating trust for which the Liquidating Trustee was appointed as the trustee. The Liquidating Trustee is authorized to "prosecute, …, compromise, …, deal with and settle, … all actions arising under state law or the Bankruptcy Code, specifically, but not limited to, Avoidance Actions arising under or related to Chapter 5 of the Bankruptcy Code and all other causes of action[.]" *See* Case No. 23-20646-gmh, ECF No. 423 at 44 (§ 3.4(e) of the Liquidating Trust Agreement).

**B.     Transfers**

41. The Debtor regularly made transfers to or for the benefit of Mr. Kiswardy, including two transfers to Restoration Hardware.

42. Upon information and belief, American Design, Ltd. provides upscale home goods, furnishings, and accessories.

43. From May 24, 2021 to October 29, 2021, the Debtor transferred funds to Restoration Hardware (collectively, the "Transfers"):

| Date | Method | Amount | Source |
|---|---|---|---|
| 5/24/2021 | Check Card 0522 | $2,901.25 | BOA x6399 |
| 5/24/2021 | Check Card 0523 | $879.85 | BOA x6399 |
| 5/28/2021 | Check Card 0527 | $802.03 | BOA x6399 |
| 5/28/2021 | Check Card 0527 | $860.50 | BOA x6399 |
| 6/1/2021 | Check Card 0528 | $11,445.50 | BOA x6399 |
| 6/4/2021 | Check Card 0603 | $3,205.65 | BOA x6399 |
| 6/7/2021 | Check Card 0605 | $6,444.90 | BOA x6399 |
| 6/10/2021 | Check Card 0609 | $11,450.25 | BOA x6399 |
| 6/11/2021 | Check Card 0611 | $1413.50 | BOA x6399 |
| 6/14/2021 | Check Card 0611 | $179.55 | BOA x6399 |

| Date | Description | Amount | Account |
|---|---|---:|---|
| 6/16/2021 | Check Card 0615 | $105.50 | BOA x6399 |
| 6/30/2021 | Check Card 0629 | $1,563.50 | BOA x6399 |
| 7/1/2021 | Check Card 0630 | $774.90 | BOA x6399 |
| 7/8/2021 | Check Card 0708 | $3,043.95 | BOA x6399 |
| 7/12/2021 | Check Card 0711 | $583.42 | BOA x6399 |
| 7/19/2021 | Check Card 0712 | $22.00 | BOA x6399 |
| 7/21/2021 | Check Card 0716 | $8,982.75 | BOA x6399 |
| 8/4/2021 | Check Card 0720 | $410.30 | BOA x6399 |
| 8/18/2021 | Check Card 0817 | $1,260.50 | BOA x6399 |
| 8/26/2021 | Check Card 0825 | $3,623.85 | BOA x6399 |
| 9/16/2021 | Check Card 0803 | $2,189.55 | BOA x6399 |
| 9/29/2021 | Check Card 0915 | $4,517.00 | BOA x6399 |
| 10/18/2021 | Check Card 0928 | $110.50 | BOA x6399 |
| 10/21/2021 | Check Card 1018 | $7,090.60 | BOA x6399 |
| 10/29/2021 | Check Card 1020 | $150.74 | BOA x6399 |
| | **Total** | **$74,791.62** | |

44. The Transfers originated from Bank of America Account No. x6399, an account titled in the Debtor's name which the Debtor used as its primary operating account. The Debtor made the Transfers through check cards, which directly drew the funds from Account No. x6399.

45. Upon information and belief, the Transfers were for Mr. Kiswardy's personal benefit. The Debtor had no obligation to make the transfers to Restoration Hardware. The Debtor was not a creditor of Restoration Hardware, the Debtor did not conduct business with Restoration Hardware, and the Debtor did not guarantee any obligations to Restoration Hardware.

**First Claim for Relief**
**Constructively Fraudulent Transfers**
**11 U.S.C. § 548(a)(1)(B)**

46. The Liquidating Trustee realleges and restates the preceding paragraphs as if fully set forth herein.

47. Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may avoid (a) any transfer of an interest of the debtor in property (b) that was made or incurred on or within

12

two years before the petition date (c) if the debtor received less than a reasonably equivalent value in exchange for such transfer and (d) the debtor was either insolvent or became insolvent as a result of such transfer, was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any remaining property was an unreasonably small capital, or the debtor intended to incur, or believed the debtor would incur, debts that would be beyond the debtor's ability to pay as those debts became due.

48. The Transfers were of interests of the Debtor in property because the Transfers originated from Bank of America Account No. x6399, a checking account titled in the Debtor's name.

49. The Transfers were made within two years of Petition Date.

50. The Debtor did not receive value in exchange for the Transfers because the Debtor did not receive "property, or satisfaction or securing of a present or antecedent debt" in exchange for the Transfers. Rather, the Debtor made the Transfers for Mr. Kiswardy's benefit. The Debtor was not indebted or otherwise obligated to Restoration Hardware and received no benefit or consideration in exchange for the Transfers.

51. The Debtor was insolvent at the time of the Transfers because the Debtor's assets exceeded its liabilities. Indeed, as of May 21, 2021, the Debtor's liabilities exceeded its assets by over $1,400,000.00.

52. At all relevant times, the Debtor's principal assets were accounts receivable from customers for services and products. Those contracts were encumbered by a general business security agreement in favor of Greenwoods State Bank and were otherwise worthless. For substantially all the contracts, the Debtor had spent or transferred the deposits such that the Debtor could not fulfil its obligations by ordering or paying for the ordered products. As a

result, the Debtor could not realize the remaining value of the accounts receivable without first obtaining additional funding to replace the already spent deposits. The Debtor obtained this funding by contracting with new customers and thus incurring additional unfunded liabilities. By the end of September 2021, the Debtor had received $3.9 million for jobs it could not perform and, by the end of February 2022, had received approximately $7 million for jobs it could not perform.

53. In addition, the Debtor was "functionally" insolvent. At the time of the Transfers, the Debtor was engaged in or was about to engage in a business for which its remaining assets were unreasonably small in relation to its business. The Debtor lacked sufficient liquidity to fulfill its obligations to its customers and trade vendors. Its primary assets—accounts receivable—were largely worthless because the underlying contracts represented unfunded liabilities. Said differently, the Debtor could not realize the benefit of the contracts without first obtaining funding to fulfill its obligations under the contracts. Under these circumstances, the Debtor's assets made bankruptcy a likely and foreseeable consequence of its continued business operation.

54. Furthermore, the Debtor reasonably should have believed that it would incur debts beyond its ability to pay as they became due. The Debtor's business operation relied on new customers entering into contracts that would pay the Debtor deposits to fund the Debtor's obligations to pre-existing (and presumably impatient) customers. The Debtor should have known that by soliciting and executing these contracts while its sole member and manager was continually depleting the Debtor's cash accounts, the Debtor would be unable to meet its obligations as they became due.

55. Restoration Hardware was the "initial transferee" because it was the first entity to receive the Transfers.

56. Mr. Kiswardy was the "entity for whose benefit such transfer was made" because the Transfers were used to purchase furniture or other products for his personal use.

57. Accordingly, under 11 U.S.C. §§ 548(a)(1)(B) and 550(a), the Liquidating Trustee is entitled to avoid and recover the value of the Transfers from Restoration Hardware and Mr. Kiswardy.

**Second Claim for Relief**
**Constructively Fraudulent Transfers**
**11 U.S.C. § 544(b) and Wis. Stat. § 242.04(1)(b)**

58. The Liquidating Trustee realleges and restates the preceding paragraphs as if fully set forth herein.

59. Section 544(b) of the Bankruptcy Code allows a trustee to avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under section 502.

60. In turn, Wis. Stat. § 242.04(1)(b) provides that a creditor (regardless of whether the creditor's claim arose before or after the transfer was made) may avoid a transfer if (a) the debtor made a transfer (b) without receiving reasonably equivalent value in exchange for the transfer or obligation and (c) the debtor was engaged in or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or the debtor believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.

61. Based on the claim register, there are a substantial number of creditors who could seek to avoid the Transfers under Wis. Stat. § 242.04(1)(b) because they currently hold claims against the Debtor.

62. The Debtor may the Transfers without receiving reasonably equivalent value in exchange for the Transfers while the Debtor was engaged in or was about to engage in a business or transaction for which the Debtor's remaining assets were unreasonably small in relation to the business and the Debtor believed or reasonably should have believed that the Debtor would incur debts beyond the Debtor's ability to pay as they became due.

63. Accordingly, under 11 U.S.C. §§ 544(b) and 550(a), and Wis. Stat. § 242.04(1)(b), the Liquidating Trustee is entitled to avoid and recover the value of the Transfers from Restoration Hardware and Mr. Kiswardy.

**WHEREFORE**, the Trustee respectfully requests the Court grant the following relief: (A) for judgment against Restoration Hardware, and Justin Kiswardy avoiding the transfers identified in this complaint and recovering the value of such transfers; (B) for an award of attorneys' fees and costs incurred in prosecuting this adversary proceeding; and (C) for such other and further relief as the Court may deem just and appropriate.

Dated: February 11, 2025.

SWANSON SWEET LLP

By:     /s/ Virginia E. George
Virginia E. George
Peter T. Nowak
107 Church Avenue
Oshkosh, WI 54901
Tel: (920) 235-6690; Fax: (920) 426-5530
vgeorge@swansonsweet.com
pnowak@swansonsweet.com

***Counsel for Paul G. Swanson,
Liquidating Trustee***